**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JAMES GRIM,<br><br>    *Plaintiff*,<br><br> v.<br><br>PENNSBURY SCHOOL DISTRICT, *et al.*,<br><br>    *Defendants*. | CIVIL ACTION<br>NO. 14-04217 |

**MEMORANDUM**

PAPPERT, J.                   **March 24, 2015**

   Plaintiff James Grim ("Grim") and his ex-wife, Jennifer Antonini ("Antonini") endured a contentious divorce in 2008-2009 and have maintained since that time a very acrimonious relationship, exacerbated further by Antonini's remarriage. The local police department and officials of the school attended by their two minor children have been drawn into this domestic dispute by Grim's repeated harassment of Antonini (and others) and his increasingly antagonistic interactions with school faculty and administrators. Grim filed this action against Defendants Pennsbury School District ("School District"), Oxford Valley Elementary School ("Oxford Valley"), Superintendent Kevin J. McHugh ("McHugh"), and Assistant Superintendent Elliott H. Lewis ("Lewis") (collectively the "School Defendants"), and the Falls Township Police Department ("Police Department"), alleging various constitutional violations stemming from restrictions the School Defendants placed on Grim from entering school property. The School Defendants and the Police Department have each filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, the Court will grant Defendants' motions and dismiss Grim's Second Amended Complaint.

**Factual Background**

Grim and Antonini have two minor children, Gabriella and Spencer.[1] (Second Am. Compl. ¶¶ 12-13.) Grim and Antonini share legal custody of the children, although Antonini has primary physical custody. (*Id.*, ¶ 14, Ex. A at 2.)[2] Grim retains partial physical custody of the children over weekends.[3] (*Id.*, Ex. A at 2-3.) By Grim's own admission, "there has been severe enmity and ill-will" between himself and Antonini since their divorce. (*Id.* ¶ 15.) Both children currently attend elementary school at Oxford Valley. (*Id.* ¶ 13.)

In December 2008, several months after their separation, the Police Department charged Grim with stalking and harassing Antonini. (*Id.*, Ex. F at 23.) Exhibits attached to the Second Amended Complaint indicate that Grim pled guilty to stalking under 18 Pa. C.S. § 2709.1 (a third-degree felony) and harassment under 18 Pa. C.S. § 2709 (a third-degree misdemeanor). (*Id.*) Grim's public criminal record reflects that Grim pled guilty to harassment, but the stalking charge was *nolle prossed*. *See Commonwealth v. Grim*, No. CP-09-CR-0000937-2009, Crim. Docket at 2, *available at* https://ujsportal.pacourts.us/DocketSheets/CPReport.ashx? docketNumber=CP-09-CR-0000937-2009 (last visited Mar. 23, 2015).[4] Both sources show that Grim was sentenced to

---

[1]      At the time of the filing of Grim's Second Amended Complaint, Gabriella was 9-years-old and Spencer was 6-years-old. (Second Am. Compl. ¶ 13.)

[2]      As many of the exhibits to Grim's Second Amended Complaint lack pagination, all citations to exhibit pages in this memorandum will refer to ECF page numbers.

[3]      In Pennsylvania, legal custody is a parent's "legal right to make major decisions affecting the best interests of a minor child, including but not limited to, medical, religious and educational decisions." *See Larson v. Diveglia*, 700 A.2d 931, 933 (Pa. 1997) (citing Pa. R. Civ. Proc. 1915.1). In comparison, physical custody is defined as "actual physical possession and control of a child." *Id.*

[4]      The Court may take judicial notice of Grim's convictions as they are part of the public record. *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1197 (3d Cir. 1993) ("Courts have defined a public record, for purposes of what properly may be considered on a motion to dismiss, to include criminal case dispositions such as convictions or mistrials").

18 months of probation and was ordered to attend anger management classes.  *Id*.; (Second Am. Compl., Ex. F at 23.)

Grim's conflict with Antonini continued after his convictions and grew to include the School District and Oxford Valley.  *See* (Second Am. Compl., Ex. F at 23-25.)  Grim alleges that Antonini befriended several teachers and school officials at Oxford Valley and poisoned them against him.  (*Id*. ¶ 16.)  On Friday, June 14, 2013, which was "Field Day" at Oxford Valley, Grim arrived to pick up Gabriella at the start of his custodial weekend.  (*Id*. ¶19.)  Grim claims he was "verbally assaulted" and "castigated" by a teacher and friend of Antonini's, Karen Rieber, for not taking more interest in his daughter.  (*Id*. ¶¶ 17, 20, 21.)  Despite Ms. Rieber's hostility, Grim "declined to dignify her with a response," and "did not engage Ms. Rieber and avoided confrontation."  (*Id*. ¶¶ 18, 22.)  Grim later "escorted his daughter back to her classroom to retriever her jacket," but does not allege that any further incident resulted.[5]  (*Id*. ¶ 23.)

About one month later, on July 17, 2013, Grim received correspondence from Mr. Sherwood Taylor, Director of Administrative Services at the School District.  (*Id*. ¶ 24.)  Mr. Taylor informed Grim that he "had been deemed aggressive, scary and threatening to staff and students," and, as a result, Grim was banned from occupying school grounds.  (*Id*.)  That same day, Grim emailed Simon Campbell, a board member of the School District, writing:

> I have spoken with Sherwood Taylor and am appauled [sic] with the outcome of our conversation.  Please contact me at your convenience.  I would like to meet with you and show you written correspondence that has Mr[.] Taylor telling me that 'IF I ATTEND ANY SCHOOL FUNCTIONS AT [O]XFORD VALLEY, I WILL BE ARRESTED[.']  I AM DISTROUGHT [sic] AND SICKENED BY THESE STATEMENTS AND FEEL HE HAS NO REASON TO MAKE SUCH THREATS.  I have a

---

[5]     Grim inconsistently argued in his opposition to the School Defendants' motion to dismiss that he actively "defended himself" against Ms. Rieber's attacks on June 14, 2013.  (Pl.'s Opp'n to Sch. Defs.' Mot. to Dismiss 10.)  Such a description of the incident makes it reasonable to believe that the encounter was more than a one-sided exchange.

> daughter going into 3rd grade and a son starting kindergarten.  I
> would like this resolved before the school year begins.

(*Id.*, Ex. G).  On July 25, 2013, Mr. Campbell forwarded Grim's email to McHugh, who

circulated Grim's email to other School District board members, writing:

> [O]ther Board members, please take note –
>
> This is an ongoing custody and civility issue – multiple chances
> given over the last year for him to act civilly.  He has intimidated
> and made staff fearful – including the Principal who is not one to
> express such concerns.  Police are now involved.  He needs to deal
> only with Sherwood.  I will not meet with him or speak with him.
> I have corresponded with him by email on a few occasions.  He
> wants desperately to engage with anyone who will listen – and
> engage and engage.  Please do not give him that opportunity.  If
> need be, refer him back to Sherwood, his attorney, or the Falls
> police.

(*Id.*)

Grim's objections to his complete ban from school property were based, at least in part, on

his custody agreement with Antonini, which gave Grim physical custody of his children on

Fridays.  (Second Am. Compl., Ex. A at 2-3; Ex. B.)  Mr. Taylor eventually responded to Grim's

objections in a letter dated August 7, 2013 ("August 7th letter"), modifying the restriction on

Grim to a partial one:

> The Pennsbury School District has reviewed your custody
> agreement and determined by court order that you are entitled to
> pick up your children at school on Fridays.  In order to comply
> with that court order, you are allowed permission to walk on
> school district property to meet your children.  However, the
> Pennsbury School District will impose a condition that you are not
> allowed within fifty feet of the schools [sic] front door.  You can
> wait for your child on the front sidewalk with the other parents but
> you cannot trespass within fifty feet of the main entrance.

(*Id.*, ¶ 25, Ex. B) (the "partial restriction").

The next day, Mr. Taylor forwarded the August 7th letter to Falls Township Police Lieutenant Henry Ward via electronic mail.  (*Id*. ¶¶ 56, 58, Ex. H) ("August 8th email chain").  Mr. Taylor wrote:

> This is a copy of a letter we sent to Mr. James Grim who is the parent I have been contacting you about for the past month.  We have placed a restriction on him that he is not allowed on school property except on [Fridays] when by court order he is allowed to pick his children up from school.  I am going to send you a copy of a recent e-mail from Mr. Grim to one of our school board members where he indicates that he will not honor our restrictions.[6]  If in fact he does not comply we will be calling on your police department to cite him for defiant trespass.

(*Id*., Ex. H.)  Lieutenant Ward replied, "Get me the Judges [sic] name on the order if you can I will [sic] the DA contact the Judge and maybe we can get the order change [sic] so he can't be there any day."  (*Id*.)  Mr. Taylor, however, declined Lieutenant Ward's proposal:

> Thanks Henry for your quick response.  What if we give the benefit of the doubt to this parent and see if he complies with our restrictions.  If he does comply we are fine.  If he violates the order then we move in the direction you recommend.

(*Id*.)  McHugh was copied on the August 8th email chain between Mr. Taylor and Lieutenant Ward.  (*Id*. ¶ 61, Ex. H.)

On September 19, 2013, Grim contacted the Police Department "regarding an e-mail [he] sent to Pennsbury School District officials."  (*Id*., ¶ 49, Ex. F at 25.)  The content of either of these communications is unclear.  (*Id*.)

In late November 2013, Grim learned that Gabriella had become sick at school one day. (*Id*. ¶ 34.)  Although Grim would have been available to retrieve his daughter, he was never contacted and Gabriella had to spend the remainder of the school day in the nurse's office.  (*Id*. ¶¶ 34-35.)  Oxford Valley told Grim that he was not contacted because the event did not occur on

---

[6]     It is unclear whether this "recent e-mail" refers to Grim's correspondence with Mr. Campbell on July 17, 2014, (Second Am. Compl., Ex. G), or a separate exchange.

a Friday.  (*Id.* ¶ 35.)  In a December 4, 2013 email, Lewis explained, "If something occurs during the time that [Antonini] has custody (Monday – Thursday 8pm) we would contact [her].  On Friday when you have custody, you would be contacted."  (*Id.* ¶ 36, Ex. C.)  Lewis also provided answers to several of Grim's other inquiries, such as tallies of how many times Gabriella visited the school nurse and guidance counselor in the past.  (*Id.*, Ex. C.)  Lewis declined to furnish the content of Gabriella's sessions with the guidance counselor because "[t]his is confidential and privileged information, in which the counselor is legally protected not to share."  (*Id.*)  Lewis confirmed that he consulted with the school solicitor regarding the partial restriction placed on Grim and "[a]ccording to the attorney we are on very sound ground."  (*Id.*)

On December 12, 2013, Michael P. Clarke, Solicitor for the School District, sent Grim a letter reiterating the partial restriction and warning that if Grim did not comply, they would contact the Police Department.  (*Id.*, ¶¶ 37-38, Ex. D.)  Mr. Clarke added:

> It has come to my attention that you have repeatedly contacted District and School officials with excessively frequent e-mails for the apparent purpose of harassing and annoying these officials. This is in clear violation of the Pennsylvania Criminal Code, 18 Pa.C.S.C. § 2709(a)(3).  You are to immediately cease and desist this practice by limiting your correspondence to no more than one e-mail per week for legitimate requests for information about your children. This e-mail is to be sent to Mr. Sherwood Taylor . . . .

(*Id.*, Ex. D at 13.)  Grim alleges that "[a]t the time of writing the letter, Mr. Clarke knew or should have known that no court of law had ever revoked or restricted [Grim]'s privilege of accessing Oxford Valley."  (*Id.* ¶ 39.)

On March 19, 2014, Sergeant Christopher Clark from the Police Department sent Grim an email with the subject line, "Meeting."  (Second Am. Compl. ¶ 46, Ex. E.)  Sergeant Clark asked if Grim had time to meet at the police station the following day "to speak . . . regarding your ongoing issues with the school district."  (*Id.*, Ex. E.)  Sergeant Clark invited Grim to "bring

along whatever documentation you believe would be useful." (*Id.*) Grim responded that he had to work the following day, but inquired whether he could call Sergeant Clark that evening instead. (*Id.*)[7] Grim alleges that this was one of several communications he had with the Police Department regarding the partial restriction and that he "rightfully viewed these communications and invitations from Falls Police as transparent threats and intimidation tactics in support of Oxford Valley and [the School District's] unlawful policies." (*Id.* ¶¶ 45, 47.)

On Friday, March 21, 2014, Grim waited to pick up Spencer within fifty feet of Oxford Valley's front entrance. (*Id.* ¶ 40.) Grim alleges that he was "verbally accosted" and "verbally assaulted" by Louis Hartman, an Oxford Valley security officer. (*Id.* ¶¶ 40-41.) In front of Spencer, Mr. Hartman warned Grim that he would be arrested if he attempted to leave with his son. (*Id.* ¶ 41.) An unknown female police officer intervened on Grim's behalf and confirmed that Grim was within the geographical boundaries of the partial restriction and could leave with his son. (*Id.* ¶¶ 42-43.) Grim claims he was never provided with an incident report despite requesting one. (*Id.* ¶ 44.)

That same day, Lieutenant Whitney visited Grim at his home to discuss a "few items." (*Id.* ¶ 51.) Grim alleges that "Whitney said he was appearing in his 'unofficial' capacity to help Grim. Whitney did not have a warrant for Grim's arrest at the time. Whitney reiterated the [partial restriction] and encouraged Grim to abide." (*Id.*)

Grim contends that "[n]either [the School District] or Oxford Valley has filed charges against Grim for harassment, assault or any other type of tort." (*Id.* ¶ 52.) Grim does, however, admit that on June 26, 2014, the Police Department filed a criminal complaint against him for

---

[7]     It is unclear from the Second Amended Complaint and exhibits whether there were subsequent communications in this email chain, or whether a meeting or call ever took place. (Second Am. Compl. ¶ 46, Ex. E.)

multiple counts of harassment and stalking related to Antonini and her new husband.[8]  (*Id*. ¶ 48,

Ex. F.)  The affidavit of probable cause attached to the June 2014 criminal complaint details a

protracted history of Grim's hostile conduct against the Antoninis,[9] their family, neighbors, and

the School Defendants, including a September 19, 2013 report that:

> Sherwood Taylor, director of the Pennsbury School District
> contacted Lt. Nelson Whitney regarding what he perceived as
> harassing and potentially threatening behavior toward employees
> of the school district as well as Oxford Valley Elementary School
> where Mr. Grim[']s children are enrolled.   Upon review of
> department records of past contact with James Grim, Lt. Whitney
> requested assistance from the Federal Bureau of Investigation
> Behavioral Analysis unit and opened a new investigation into
> James Grim's behavior.

(*Id*., Ex. F at 25.)  The affidavit of probable cause also states, "At the time of this writing Falls

Township Police took report of additional harassing messages to School District Officials.  That

investigation is still open."  (*Id*., Ex. F at 26.)

As a result of the partial restriction, Grim complains that he has been unable to

communicate with his children's teachers.  (*Id*. ¶ 29.)  Grim also alleges that he has been denied

access to his children's complete student records.  (*Id*. ¶ 30.)  When Grim did receive records,

they were outdated and "thus completely useless."  (*Id*. ¶ 31.)  Grim claims that he "still receives

class assignments or syllabi for [his] children's fall classes late."  (*Id*. ¶ 32.)  Consequently, Grim

has been unable to participate meaningfully in his children's education.  (*Id*. ¶ 33.)  Grim avers

---

[8]     The June 2014 charges resulted in Grim pleading guilty to four counts of disorderly conduct under 18 Pa.
C.S. § 5503(a)(4) and being sentenced to a total of 360 days of probation on January 5, 2015.  *See Commonwealth v.
Grim*, No. CP-09-CR-0005361-2014, Crim. Docket at 4-5, *available at* https://ujsportal.pacourts.us/DocketSheets/
CPReport. ashx?docketNumber=CP-09-CR-0005361-2014 (last visited Mar. 23, 2015).  The Court takes judicial
notice of these convictions as part of the public record.  *Pension Ben. Guar. Corp.*, 998 F.2d at 1197.

[9]     The Court need not repeat here the numerous reports of Grim's antagonistic behaviors towards Antonini
(and others) contained in the affidavit of probable cause.  (Second Am. Compl., Ex. F at 23-26.)  Among other
instances of menacing conduct by Grim, it was reported that Grim made 102 calls to Antonini in a 30-day period,
clandestinely observed Antonini during her daily routines, left handwritten notes tied to Antonini's mailbox outlining
his dismay at her live-in boyfriend and that she did not notify him about "back to school" night, and aggressively
approached one of Antonini's next-door neighbors and her children after the neighbor had testified in a custody
hearing against Grim.  (*Id*., Ex. F at 23-25.)

that the Police Department "never bothered to investigate the underlying allegations of what constituted [Grim]'s alleged 'harassing and threatening behavior' toward school officials," and that McHugh "understood, directed, oversaw and orchestrated the combined efforts of [the School District], Oxford Valley and [the Police Department] to deny [Grim]'s constitutionally protected rights vis-à-vis his participation in his children's education."  (*Id.* ¶¶ 53-54.)

**Procedural Background**

Grim filed his original Complaint on July 11, 2014 against the School Defendants, the Police Department, and Calkins Media Inc. ("Calkins").  (Compl. ¶¶ 1-2.)  Grim brought various constitutional claims under 42 U.S.C. § 1983 against the School Defendants and the Police Department, including violations of the Equal Protection Clause under a "class of one" theory (Count I), his substantive due process rights (Count II), his procedural due process rights (Count III), and his Fourteenth Amendment liberty interest in reputation (Count IV).  (*Id.* ¶¶ 65-92.) Grim also brought common law claims for defamation (Count V) and False Light (Count VI) against Calkins, owner of the *Bucks County Courier Times*, which reported on Grim's June 2014 stalking and harassment charges in a single article.  (*Id.* ¶¶ 13, 93-106, Ex. G.)  After Defendants moved to dismiss, (ECF Nos. 5, 8, 10), Grim filed an Amended Complaint as of right on August 29, 2014.  (ECF No. 11.)

The School Defendants and Police Department moved to dismiss the Amended Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  (ECF Nos. 15, 20).  Calkins also moved to dismiss the Amended Complaint, both for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  (ECF Nos. 13-14.)  Judge Paul S.

Diamond[10] granted Calkins' motion, declining to exercise supplemental jurisdiction over Grim's common law claims in Counts V-VI.  (ECF No. 28.)  Judge Diamond also granted the Police Department's motion because Grim failed to plead that a municipal policy or custom of the Police Department caused his alleged constitutional violations.  (ECF No. 27.)  Judge Diamond dismissed Counts I-IV against the Police Department without prejudice and gave Grim leave to amend his complaint a second time.  (*Id.*)

Grim filed his Second Amended Complaint on November 18, 2014, alleging the same Counts I-IV against the School Defendants and the Police Department.[11]  (Second Am. Compl. ¶¶ 62-101.)  The School Defendants and the Police Department each filed a motion to dismiss the Second Amended Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  (ECF Nos. 32, 33.)  Grim filed briefs in opposition (ECF Nos. 35, 36), and the Police Department filed a reply.  (ECF No. 37.)  A conference with the parties was held on March 9, 2015.  (ECF Nos. 39, 41.)  The Court will consider the School Defendants' and the Police Department's motions to dismiss separately.

**Standard of Review**

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead factual allegations sufficient "to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007).  The "mere possibility of misconduct" is not enough; the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," *i.e.*, sufficient facts to permit "the court to draw the reasonable inference

---

[10]  This case was reassigned to this Court after Judge Diamond's rulings.  (ECF No. 38.)

[11]  Upon the filing of the Second Amended Complaint, the School Defendants' Motion to Dismiss the Amended Complaint was dismissed as moot.  (ECF No. 30.)

that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678-79 (2009) (quotation omitted).

The court must construe the complaint in the light most favorable to the plaintiff. *In re Ins. Brokerage Antitrust Litig.,* 618 F.3d 300, 314 (3d Cir. 2010) (quoting *Gelman v. State Farm Mut. Auto. Ins. Co.*, 583 F.3d 187, 190 (3d Cir. 2009)).  However, while all allegations contained in the complaint must be accepted as true, the court need not give credence to mere "legal conclusions" couched as facts. *Iqbal,* 556 U.S. at 678.  "To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

## Discussion

A municipality cannot be held liable under § 1983 based solely on the conduct of its employees. *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 691 (1978).  For liability to attach under § 1983, the municipality *itself* must cause the constitutional violation at issue. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989).  Plaintiffs must demonstrate that the violation of their rights was caused by a policy, custom or practice of the municipality. *Beck v. City of Pittsburgh,* 89 F.3d 966, 971 (3d Cir. 1996).  "To satisfy the pleading standard, [a plaintiff] must identify a custom or policy, and specify what exactly that custom or policy was." *McTernan v. City of York*, 564 F.3d 636, 658 (3d Cir. 2009).  If a plaintiff alleges that he or she was harmed by a custom, as opposed to a formally enacted policy, "[c]ustom requires proof of knowledge and acquiescence by the decisionmaker." *Id*.  Failure "to allege conduct by a municipal decisionmaker" is "fatal" to a *Monell* claim. *Id*.; *see also Santiago v. Warminster Twp.*, 629 F.3d 121, 135, n.11 (3d Cir. 2010) (noting that plaintiff has "the obligation to plead in

some fashion that [the decisionmaker] had final policy making authority, as that is a key element of a *Monell* claim.").  In addition, a plaintiff must establish causation by properly pleading that the municipality's policy or custom "was the source of [his or] her injury."  *Santiago*, 629 F.3d at 135.

## I.      Counts I-IV Against the Police Department

The Police Department moves to dismiss the Second Amended Complaint because (1) it is a non-suable entity; and (2) Grim has failed to properly plead a *Monell* claim against it.  (Mem. in Supp. of Police Dept. Mot. to Dismiss 6.)

A police department cannot be sued *in conjunction with* its municipality because it is merely an administrative arm of the municipality.  *DeBellis v. Kulp*, 166 F. Supp. 2d 255, 264 (E.D. Pa. 2001) (emphasis added).  Falls Township is not, however, a named defendant here.  In the absence of a statute to the contrary, courts have allowed a plaintiff's claim against a police department alone to move forward.  *Compare Simpson v. Owner of Dollar Tree Store*, No. 09-6162, 2010 WL 3364200, at *4 (E.D. Pa. Aug. 23, 2010) (treating claims asserted against only the Parkesburg and Coatesville Police Departments as though they were asserted against the cities of Parkesburg and Coatesville) (citing *Bonenberger v. Plymouth Twp.,* 132 F.3d 20, 25 n.4 (3d Cir. 1997) ("[W]e treat the municipality and its police department as a single entity for purposes of section 1983 liability.")), *with Gremo v. Karlin*, 363 F. Supp. 2d 771, 780-81 (E.D. Pa. 2005) (dismissing claims against a police department in reliance on local statute that required suits against police departments to be filed against the city only).  Regardless, the Court need not devote further time to this question because the Police Department's second argument is dispositive of the case against it.

Grim's *Monell* claims against the Police Department in the Second Amended Complaint

fail for the same reasons his claims in the Amended Complaint failed—Grim has not pled that a

policy or custom of the Police Department caused his alleged constitutional violations.  In

granting the Police Department's motion to dismiss the Amended Complaint, Judge Diamond

explained:

> [Grim] alleges several police officers communicated with him
> about the school's restrictions on his conduct; a sergeant asked him
> to come to the station to discuss . . . his problems with the school;
> the Department filed a criminal complaint against him; a police
> officer appeared at his home to encourage him to abide by the
> school restrictions; the Department "conspired" with the school;
> and the Department failed to investigate before filing the criminal
> complaint.  Because he does not allege any official proclamations,
> policies or edicts that caused or affected the Department's behavior
> toward him, he cannot attribute the alleged violations to
> Department policy.  Similarly, he has not pled that there were any
> "permanent and well settled" practices relating to the Department's
> allegedly improper actions, and has thus failed to plead that custom
> caused the alleged violations.

(ECF No. 27, at 2-3) (citations omitted).

Grim has not remedied these deficiencies in the Second Amended Complaint.  In

attempting to plead a municipal policy or custom in his Second Amended Complaint, Grim added

the recurring allegation:

> Defendant [Police Department], through the suggested conduct of
> Lieutenant Ward, affirms a brazen custom of subverting all facets
> of due process by advocating judicial tampering and abuse of
> process.

(Second Am. Compl. ¶¶ 70, 79, 89.)  Grim seems to be arguing that the August 8th email chain

between Lieutenant Ward and Mr. Taylor evidences this "brazen" municipal custom.  (Pl.'s

Opp'n to Police Dept. Mot. to Dismiss 11.)  Grim's allegations remain insufficient as a matter of

law for two reasons.

First, with regard to the Police Department's alleged custom of "subverting all facets of due process by advocating judicial tampering and abuse of process," the Court is not bound to accept as true legal conclusions couched as factual allegations.  *Iqbal*, 556 U.S. at 678.  Grim needs to provide some factual support to raise this boilerplate allegation of a "brazen custom" above the speculative level.  *Twombly,* 550 U.S. at 555.  Grim does not do this apart from pointing to the August 8, 2014 email chain.  (Pl.'s Opp'n to Police Dept. Mot. to Dismiss 11.)  Assuming in a light most favorable to Grim that the August 8th email chain provides such factual support, however, it is still of no avail.  "Custom requires proof of knowledge and acquiescence by the decisionmaker."  *McTernan*, 564 F.3d at 658.  Grim has not alleged that Lieutenant Ward was a decisionmaker of the Police Department; indeed, the Second Amended Complaint does not identify *any* alleged decisionmaker from the Police Department.  Failure to allege such knowledge and conduct by a decisionmaker is "fatal" to a *Monell* claim.  *Id.*

Second, Grim's *Monell* claims against the Police Department fail for lack of causation.  The gravamen of Grim's Second Amended Complaint is that he suffered various constitutional violations because of the restrictions imposed on him by the School Defendants.  Grim claims that these restrictions denied him his right as a parent to participate meaningfully in his children's education.  (Second Am. Compl. ¶ 33.)  These restrictions, however, were imposed independently by the School Defendants.  (*Id*. ¶¶ 24-33.)  Nowhere in the Second Amended Complaint does Grim allege that the Police Department actively participated in issuing the restrictions on Grim.  Grim's assertion that, after the restrictions were put in place, the Police Department "never bothered to investigate," is of no consequence.  (*Id*. ¶ 53.)  To be held liable under *Monell*, the Police Department itself must have actually caused the constitutional violations at issue.  *City of Canton*, 489 U.S. at 385 ("It is only when the execution of the government's policy or

custom . . . inflicts the injury that the municipality may be held liable under § 1983.") (alteration in original) (quotation omitted).

The same reasoning applies to Lieutenant Ward's "suggestion" in the August 8th email chain to get Grim's custody order modified.  (Second Am. Compl. ¶ 100.)  Regardless of what suggestion was made, no action was ever, in fact, taken.  (*Id.*, Ex. H.)  Without a municipal action to cause Grim's injury, *Monell* liability cannot attach.  *Santiago*, 629 F.3d at 135.  Grim argues that the fact that he "cannot allege that Lt. Ward [sic] Mr. Taylor completed the threatened acts in this instance does not detract from their nefarious character.  For what other benign 'policies' or 'customs' are lurking in the penumbras of undiscovered e-mails pertaining to [him]?"  (Pl.'s Opp'n to Police Dept. Mot. to Dismiss 12.)  Grim's argument misses the mark; the "nefarious character" of the suggested act is wholly irrelevant.  For Grim's *Monell* claim against the Police Department to survive a motion to dismiss, he must at least plead a Police Department policy or custom caused his constitutional injuries.  Grim has not done so.  Counts I-IV against the Police Department are dismissed.

## II.     Counts I-IV Against the School Defendants

Grim has sufficiently identified a policy or custom of the School Defendants under *Monell*.  The Second Amended Complaint alleges that the School Defendants instituted a policy to partially restrict Grim's access to the premises of his children's school.  (Second Am. Compl. ¶¶ 25, 65, 68, 75, 77, 83, 87, 93.)  Grim further claims that the School Defendants restricted his communications with his children's teachers, and denied him access to his children's complete student records.  (*Id.* ¶¶ 29-32, 65, 77, 87, 93.)  As a result of these restrictions, Grim avers that his constitutionally protected parental right to participate in his children's education has been violated.  (*Id.* ¶¶ 33, 68, 73, 77, 87, 98.)

15

Although Grim refers to these restrictions as an "arbitrary policy," (*Id*. ¶¶ 68, 77, 87), the Court finds that the Second Amended Complaint alleges a custom.  Grim has asserted that Superintendent McHugh was a decisionmaker of the School District who possessed final policy-making authority.  (*Id*.)  The Second Amended Complaint shows that McHugh both knew and acquiesced to the restrictions placed upon Grim.  *E.g.,* (*Id*., Ex. G) (McHugh email to School District board members directing them to take note of and enforce restrictions placed upon Grim).  Because Grim has adequately pled that a municipal custom caused his constitutional injury, his allegations have made the threshold showing for *Monell* liability to attach.  *McTernan*, 564 F.3d at 658; *Santiago*, 629 F.3d at 135.

The United States Supreme Court has cautioned the federal judiciary against intervening "in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values."  *Epperson v. Arkansas,* 393 U.S. 97, 104 (1968).  Because public education is committed to control of state and local authorities, "[j]udicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint."  *Id.*  "[The Supreme] Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools."  *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969); *see also Goss v. Lopez,* 419 U.S. 565, 589-90 (1975) (Powell, J., dissenting) ("[S]chool authorities must have broad discretionary authority in the daily operation of public schools.  This includes wide latitude with respect to maintaining discipline and good order.").  With these principles in mind, the Court now turns to the substance of each of Grim's alleged constitutional violation claims against the School Defendants.

### A.      *Violation of Equal Protection under "Class of One" Theory (Count I)*

The School Defendants argue that Count I should be dismissed because Grim fails to sufficiently allege that he was treated differently from others similarly situated.  (Mem. in Supp. of Sch. Defs.' Mot. to Dismiss 5.)  Particularly, the School Defendants acknowledge that Grim claims he was treated differently from the Antoninis, (Second Am. Compl. ¶¶ 27, 65-66), but they argue that the Antoninis are not proper comparators because "there is no allegation that [Grim's] ex-wife or his ex-wife's current husband had a six year history of complaints involved in stalking or that complaints were made about them by teachers at the school."  (Mem. in Supp. of Sch. Defs.' Mot. to Dismiss 5) (citation omitted).  The Court agrees.

Under a "class of one" theory, established by the Supreme Court in *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam), Grim must allege that (1) the School Defendants treated him differently from others similarly situated, (2) the School Defendants did so intentionally, and (3) there was no rational basis for the difference in treatment.  *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006).  "Persons are similarly situated under the Equal Protection Clause when they are alike 'in all relevant aspects.'"  *Startzell v. City of Philadelphia,* 533 F.3d 183, 203 (3d Cir. 2008) (quoting *Nordlinger v. Hahn,* 505 U.S. 1, 10 (1992)).  At the motion to dismiss stage, Grim must allege facts sufficient to make plausible the existence of such similarly situated parties and that they are alike in all relevant aspects.  *Perano v. Twp. of Tilden*, 423 F. App'x 234, 238-39 (3d Cir. 2011) (affirming grant of motion to dismiss plaintiff's equal protection claim because formulaic recitation that "other similarly situated residential and commercial developers" were treated differently was not enough).

Here, Grim has adequately pled facts to show that his similarly situated parties—the Antoninis—exist, but he has failed to allege facts sufficient to make plausible that they are like him in all relevant aspects.  The lengthy narrative laid out in the Second Amended Complaint and

its exhibits makes clear that Grim was nothing like the Antoninis in at least one dispositive way: he had a criminal record and a history of conflict with School District staff.  Grim's assertion that he is a "prototypical 'class of one' plaintiff," just a "hapless private citizen" being penalized by the School Defendants, is flatly contradicted by his own complaint and the exhibits attached to it. (Pl.'s Opp'n to Sch. Defs.' Mot. to Dismiss 13).  The Second Amended Complaint and its exhibits show that Grim had "ongoing" problems with the School Defendants; that "multiple chances were given over the last year for him to act civilly"; and that Grim still "intimidated and made staff fearful – including the Principal who is not one to express such concerns."  (Second Am. Compl., Ex. G.)  Grim's repeated hostile and threatening behaviors were documented in years' worth of Police Department reports and eventually led to a second round of stalking and harassment charges in 2014.  (*Id*., Ex. F.)  Grim is not "prototypical" or "hapless" at all.

Even at the motion to dismiss stage, the Court need not accept Grim's conclusory assertion that others are similarly situated when it is clear from the face of the Second Amended Complaint that they are not.  *See Spiker v. Whittaker*, 553 F. App'x 275, 280-81 (3d Cir. 2014) (affirming grant of motion to dismiss because plaintiff "fails to show that the other offenders were similarly situated. . . . Of the twenty other sex offenders to whom Spiker compares himself, only one was also convicted under § 4304(a)(1), and he registered 13 days sooner than Spiker."); *Pioneer Aggregates, Inc. v. Pa. Dep't of Envtl. Prot.*, 540 F. App'x 118, 124 (3d Cir. 2013) (affirming grant of motion to dismiss because, *inter alia*, despite Pioneer's claims that other nearby mines were similarly situated, "Pioneer's Laflin Quarry is at least partly an active mine, while the Coplay Quarry is an inactive mine."); *Mann v. Brenner*, 375 F. App'x 232, 238-39 (3d Cir. 2010) ("Although he alleges that '[o]ther citizens are not treated in this fashion, particularly the political leaders of the City of York', Mann fails to plead that he was treated differently than

other similarly situated individuals, that is, other property owners of blighted structures in the City of York. . . . Without any allegation regarding other blighted property owners, Mann simply cannot 'nudge [his] claims across the line from conceivable to plausible.'") (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008)) (record citations omitted).

Accordingly, Grim has failed to sufficiently plead the first element of his equal protection claim. The Antoninis are not alike in all, indeed if any, relevant aspects. Nor does Grim allege that there are any other parents of Oxford Valley school children who share his criminal background and conflicts with school officials but who have not had similar restrictions placed upon them. *See Cwik v. Dillon*, No. 1:09-cv-669, 2010 WL 5691404, at *7 (S.D. Ohio Sept. 20, 2010) ("Plaintiff has identified no parents who were permitted unrestricted access to school grounds following disruptive behavior on their part. As such, Plaintiff has failed to establish that Defendants discriminated against him as a 'class of one.'"), *report and recommendation adopted*, 2011 WL 379039 (S.D. Ohio Feb. 2, 2011). Because the Second Amended Complaint is devoid of any such allegations of proper comparators, Count I fails as a matter of law.

Grim's equal protection claim also fails because it is clear from the face of the Second Amended Complaint that the School Defendants had a rational basis for issuing restrictions on Grim. Rational basis has been defined as "a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*, 509 U.S. 312, 320 (1993). In determining on a motion to dismiss whether there is a rational basis for the government's action, courts typically look to the complaint itself for evidence of a rational basis. *Prof'l Dog Breeders Advisory Council, Inc. v. Wolff*, 752 F. Supp. 2d 575, 590 (E.D. Pa. 2010); *Cradle of Liberty Council, Inc. v. City of Philadelphia*, No. 08-cv-2429, 2008 WL 4399025, at *7 n.3 (E.D. Pa. Sept. 25, 2008); *accord Pioneer Aggregates*, 540 F. App'x at 124 (affirming dismissal of

equal protection claim pursuant to Rule 12(b)(6) because even if plaintiffs' alleged comparators were similarly situated, "a rational basis existed for the PADEP to distinguish between them since the defendants 'gave Plaintiffs specific reasons as to why the clean fill at the WABP did not meet the regulatory requirements.'").

Although Grim contends that "[n]o[t] once has any authority from Pennsbury or Oxford Valley articulated a rationale [sic] basis for the severe and draconian actions taken against Grim," (Pl.'s Opp'n to Sch. Defs.' Mot. to Dismiss 13), this argument is belied by the Second Amended Complaint and its exhibits. *E.g.,* (Second Am. Compl. ¶ 24) ("[Grim] received correspondence from Sherwood Taylor, Director of Administrative Services at Pennsbury, advising that [Grim] had been deemed aggressive, scary and threatening to staff and students, and, as a result, [Grim] was banned from occupying school grounds."); (*id.*, Ex. D) (Grim received letter from Solicitor for School District stating, "It has come to my attention that you have repeatedly contacted District and School officials with excessively frequent e-mails for the apparent purpose of harassing and annoying these officials.  This is in clear violation of the Pennsylvania Criminal Code . . . . You are to immediately cease and desist this practice by limiting your correspondence to no more than one e-mail per week for legitimate requests for information about your children.").

The Court need not accept Grim's assertion that the School Defendants had no rational basis for the restrictions when that contention is contradicted by events laid out in the Second Amended Complaint and the exhibits attached thereto. *See Brace v. Cnty. of Luzerne*, 873 F. Supp. 2d 616, 631 (M.D. Pa. 2012) ("While Plaintiff has alleged that Defendants intentionally treated him differently than other similarly situated individuals, the face of Plaintiff's Complaint makes clear that Defendants had a rational basis for the alleged difference in treatment based on

these facts. . . . Defendants had a rational reason to terminate Plaintiff's benefits—his guilty plea to a crime 'substantially the same' as one enumerated in Section 1312.  Thus, even though Plaintiff alleges that the Board acted without a rational basis, because the Court is not required to credit Plaintiff's 'legal conclusions,' Plaintiff's 'class-of-one' equal protection claim will be dismissed with prejudice.") (citations omitted), *aff'd*, 535 F. App'x 155 (3d Cir. 2013); *accord Iqbal,* 556 U.S. at 678 (instructing that courts need not give credence to mere "legal conclusions" couched as facts).

Even construing all facts in a light most favorable to Grim, it is readily apparent from the face of the Second Amended Complaint that the School Defendants imposed these restrictions because they perceived Grim to be a threat to school safety and tranquility.  Schools have a legitimate interest in maintaining peace and good order within their halls.  *See Carey v. Brown*, 447 U.S. 455, 470-71 (1980) ("[N]o mandate in our Constitution leaves [state officials] powerless . . . to protect the public from the kind of boisterous and threatening conduct that disturbs the tranquility of spots . . . that require peace and quiet to carry out their functions, such as . . . schools") (quotation omitted); *see also Tinker*, 393 U.S. at 507; *accord Goss v. Lopez,* 419 U.S. at 589-90 (Powell, J., dissenting).  Even at the motion to dismiss stage, this is enough for the Court to conclude that the School Defendants had a rational basis for limiting Grim's access to school premises and communications with school staff to one day per week.  Count I is dismissed against the School Defendants.

### B.    *Violations of Substantive and Procedural Due Process (Counts II-III)*

The School Defendants argue that Counts II and III should be dismissed because Grim does not have a constitutional due process right to access school property.  (Mem. in Supp. of Sch. Defs.' Mot. to Dismiss 6.)  The School Defendants are correct.

In a § 1983 action, whether analyzing claims for substantive or procedural due process, a court must initially determine whether the plaintiff has alleged the deprivation of a right protected either by federal law or the Constitution. *Bangura v. City of Philadelphia*, No. 07-cv-00127, 2008 WL 934438, at *3 (E.D. Pa. Apr. 1, 2008) (Padova, J.) (citing *Gruenke v. Seip*, 225 F.3d 290, 298 (3d Cir. 2000)). It is well-established that a parent has a constitutional right "to direct the upbringing and education of children under their control." *Wisconsin v. Yoder*, 406 U.S. 205, 232-33 (1972) (citing *Meyer v. Nebraska*, 262 U.S. 390 (1923)).

The Third Circuit has cautioned that we should use a restrained approach in the area of due process. *Henry v. City of Erie*, 728 F.3d 275, 286 (3d Cir. 2013) ("The [Supreme] Court has said that 'guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended,' and cautioned that courts must 'exercise the utmost care whenever . . . asked to break new ground in this field.'") (quoting *Collins v. City of Harker Heights,* 503 U.S. 115, 125 (1992)).

While this Court has found no binding authority in this Circuit regarding whether a parent has a constitutional right to access school property, a number of courts have answered the question in the negative. The most frequently cited case is *Lovern v. Edwards*, where Lovern was barred by Superintendent Edwards from entering the premises of his children's school "due to his continuing pattern of verbal abuse and threatening behavior towards school officials, including staff and School Board members." 190 F.3d 648, 651-52 (4th Cir. 1999) (quotations omitted). The Fourth Circuit affirmed the grant of Edwards' motion to dismiss Lovern's § 1983 claims for, *inter alia*, deprivation of his constitutional parental rights, finding that Lovern's "assertions that school administrators must provide him with boundless access to school property are obviously without merit," and that the case was "a monument to what ought not to be in a federal court." *Id.* at 656 (quotations omitted). The Fourth Circuit further reasoned:

> School officials have the authority to control students and school personnel on school property, and also have the authority and responsibility for assuring that parents and third parties conduct themselves appropriately while on school property. . . . such officials should never be intimidated into compromising the safety of those who utilize school property.

*Id.* at 655 (citations omitted).[12]

In *Cole v. Montague Bd. of Educ.*, 145 F. App'x 760 (3d Cir. 2005) (per curiam), the Third Circuit relied on *Lovern* in a similar scenario. Reginald and Laura Cole alleged that the defendant school board violated their parental due process rights by banning them from school property without a hearing. *Id.* at 761. The Third Circuit affirmed the district court's dismissal, stating, "As to the claim that the School Board violated the Coles' due process rights by 'illegally' banning them from school property, this contention plainly lacks merit." *Id.* at 762-63 (citing *Lovern*, 190 F.3d at 648). The Third Circuit also refused to find that a court order was necessary before the school had Mr. Cole escorted from the premises. *Id.* at 762 ("[T]he Coles have not provided any authority in support of their argument that Officer Loevlie needed a court order to remove Reginald from school property.").

The Eleventh Circuit followed the reasoning of *Lovern* and *Cole* in its own parental rights case. In *Porter v. Duval Cnty. Sch. Bd.*, 406 F. App'x 460 (11th Cir. 2010), Porter alleged that school officials violated her due process rights by denying her access to her daughter's school. *Id.* at 462. The Eleventh Circuit affirmed the district court's grant of defendants' motion to dismiss. *Id.* ("Porter's claim as to the school's restrictions on her access to school property was not cognizable under § 1983. While parents have a general due process right to direct their

---

[12]     The Fourth Circuit ultimately upheld dismissal of the complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction because "Lovern's claims against Superintendent Edwards in this case are plainly insubstantial and entirely frivolous." *Lovern v. Edwards*, 190 F.3d 648, 656 (4th Cir. 1999). Therefore, the Fourth Circuit found "that Lovern's constitutional rights were [not] 'directly and sharply' implicated by [the school's] prohibition against him." *Id.* (citing *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)).

children's education without unreasonable interference by the states, Porter has provided no legal support for the proposition that this right includes the right to access school premises.") (citing *Meyer,* 262 U.S. at 400; *Lovern,* 190 F.3d at 655-56).

Many district courts, including one in this Circuit, have followed suit. *Cunningham v. Lenape Reg'l High Dist. Bd. of Educ*. dealt with a parent who was "banished from Board property due to a persistent pattern of abuse, harassment and threats towards staff members." 492 F. Supp. 2d 439, 444 (D.N.J. 2007) (quotation omitted). Cunningham denied the allegations, and the school board subsequently amended Cunningham's ban to allow him limited access so he could continue coaching for a youth wrestling program and attend his son's wrestling matches. *Id*. This amended restriction was subject to the conditions "of arriving at a specific time for coaching, a duty to report when attending wrestling matches involving his son, a duty to immediately depart at the conclusion of a match, and a ban on any communications with any wrestler or staff member during a match." *Id*. (quotation omitted). Cunningham filed a lawsuit against the school board and superintendent for violations of his First Amendment rights and claimed that he had been "denied the right to enjoy the benefits of being a parent of a student[,] including the ability to speak to school officials or otherwise act in matters concerning his son." *Id*. (quotation omitted).

The district court dismissed Cunningham's complaint pursuant to Rule 12(b)(1), relying on *Lovern*, and stating that "previous decisions of the courts do in fact foreclose questions about whether a person has the right or benefit of access to schools." *Id*. at 448. While recognizing a parent's constitutional right to direct the education and upbringing of his or her children, the court reasoned that "the reality of our times, and indeed common sense, suggests that the public—parents included—cannot have unfettered access to the halls of learning. We are not too far removed from the tragedies of Columbine or the Amish school shooting to forget that the safety

of our children and school officials is paramount." *Id*. at 450-51.  The court also explained that

Cunningham's right to communicate was not limitless.  *Id*. at 448 (citing *Carey,* 447 U.S. at 470);

*see also Lovern*, 190 F.3d at 656 (same).  "The Supreme Court has held, for example, that even

peaceful communication may be restricted through reasonable measures where it interferes with

'vital governmental facilities.'  The Constitution does not leave the government powerless to

protect against disruptive conduct, even speech, in public places such as schools 'that require

peace and quiet to carry out their functions.'"  *Cunningham*, 492 F. Supp. 2d at 448-49 (citing

*Carey,* 447 U.S. at 470-71).

*Mejia v. Holt Pub. Sch.* concerned a father who had been completely banned from school

property after he was reported masturbating in his car in the school parking lot.  No. 5:01-cv-116,

2002 WL 1492205, at *1 (W.D. Mich. Mar. 12, 2002).  The court established that "a school may

ban a person, including a parent, from going onto school property in order to preserve order in the

educational process or to protect students from potential harm without violating any fundamental

right to go onto or access school property." *Id*. at *4.  The court further found, after examining

Supreme Court precedent, that the ban did not implicate Mejia's constitutional right to direct and

control the education of his child.  *Id*. at *5-6.

> The Mejias have not cited any case supporting their argument that
> they have a fundamental right to participate in their child's
> education by being present on school property, and, given the
> Supreme Court's restraint in delineating the scope of parents'
> fundamental rights with respect to education, this Court declines to
> hold that parents have a fundamental right to participate in their
> children's education through physical access to school property,
> teachers, or administrators.

*Id*. at *6 (citation omitted).

Furthermore, the court reasoned that Mejia's physical exclusion from school property did

not prevent him from communicating with his child's teachers and other school authorities.  *Id*.

The court noted that "there are always alternate channels of communication available," and that while it was "probably true that the educational experience will be less enriching for both parent and child if the parent is barred from coming onto school property," such a concern did "not raise a constitutional issue." *Id.*

See also *Ryans v. Gresham*, 6 F. Supp. 2d 595, 601 (E.D. Tex. 1998) ("An exhaustive review of the case law pertaining to the constitutional right of parents to direct the education of their children discloses no holding even remotely suggesting that this guarantee includes a right to access to the classes in which one's child participates."); *Justice v. Farley*, No. 5:11-cv-99, 2012 WL 83945, at *1, 3 (E.D.N.C. Jan. 11, 2012) ("[A parent's general constitutional right] is limited in scope and does not include the unfettered right to access school premises. . . . Therefore, the court concludes that plaintiff was not deprived of a life, liberty, or property interest when he was banned from the school campus [and calling or talking to school staff].") (citations omitted); *Miller v. Montgomery Cnty. R-II Sch. Dist., Bd. of Educ.*, No. 2:10-cv-78, 2011 WL 1299536, at *3 (E.D. Mo. Apr. 1, 2011) (granting motion to dismiss procedural due process claim because a "parent does not have the right to unfettered access to school property.  Therefore, the School District was not required to conduct a hearing before banning plaintiff from entering School District property.") (citations omitted); *Cwik*, 2010 WL 5691404, at *6 (granting defendants' motion to dismiss parent's substantive and procedural due process challenges to school's ban because "Plaintiff's liberty interest in directing the education of his children does not extend to a constitutional right to unlimited admittance into or onto the building or grounds of his children's school."); *Mayberry v. Indep. Sch. Dist. No. 1 of Tulsa Cnty.*, No. 08-cv-416, 2008 WL 5070703, at *5 (N.D. Okla. Nov. 21, 2008) (granting defendants' motion to dismiss parent's § 1983 action challenging temporary school ban on due process grounds because "[t]he record is replete with

26

decisions by courts that parents do not have a constitutional right to be on school premises."); *cf.*
*Henley v. Octorara Area Sch. Dist.*, 701 F. Supp. 545, 551 (E.D. Pa. 1988) ("[S]chool authorities
could impose reasonable restrictions upon members of the public who were not students from
coming onto the school grounds. . . . The right to come onto the school property was not such a
right as to require any sort of a due process hearing before making the classification that excluded
Mr. Henley.") (citing *Mathews v. Eldridge,* 424 U.S. 319 (1976)).

There is also authority within this district that a parent's general right to direct the
education of his child does not encompass a right to complete access to his child's school records.
*See Bangura*, 2008 WL 934438, at *4 ("[A] parent simply has no *constitutional* right to obtain
information regarding her child's education . . . . Indeed, Plaintiff cites us to no authority that
recognizes such right[] under the United States Constitution (or other federal law) and instead
relies solely on her general constitutional liberty right to care for and guide her child.  The School
District Defendants' failure to provide Plaintiff with information regarding R.L.'s school
performance and activities . . . simply did not deprive Plaintiff of that overall right").  Grim has
not identified cases to the contrary.

The Court finds these cases persuasive and sees no reason to depart from their rationale.
Grim's parental right to direct the education of his children has not been violated by the
restrictions placed upon him by the School Defendants.  The restrictions are not absolute; Grim is
allowed to enter school property to pick up his children on Fridays, consistent with his custody
agreement.  (Second Am. Compl., Exs. A-B.)  Just as the court observed in *Mejia*, Grim does not
need physical access to school property to talk with his children's teachers because alternate
channels of communication are always available, such as telephone, email, notes, etc.  Grim is
clearly aware of such channels as he has been accused of abusing them in the past, (*id.*, Ex. D),

yet he is still allowed to communicate with the school on a weekly basis to submit any legitimate questions he may have regarding his children's education. (*Id.*) While Grim alleges that he "has been denied access to his children's *complete* student records," (*id.* ¶ 30) (emphasis added), Grim admits that he does receive some of his children's records, including class assignments and syllabi. (*Id.* ¶¶ 31-32.) Given the restrained approach we must use when breaking new ground in this area, *Henry*, 728 F.3d at 286 (citing *Collins,* 503 U.S. at 125), the Court concludes that Grim does not have a constitutional due process right to unlimited access to school property, staff, and records. Grim's substantive and procedural due process claims against the School Defendants (Counts II-III) are accordingly dismissed.

### C. Violation of Grim's Liberty Interest in Reputation (Count IV)

The School Defendants argue that Count IV should be dismissed because Grim has not alleged a tangible injury in addition to reputational harm, as he must in order to recover under § 1983. (Mem. in Supp. of Sch. Defs.' Mot. to Dismiss 7-8.)

To sufficiently plead a claim for deprivation of one's liberty interest in reputation under § 1983, "a plaintiff must show a stigma to his reputation *plus* deprivation of some additional right or interest." *Hill*, 455 F.3d at 236 (citing *Paul v. Davis*, 424 U.S. 693, 701 (1976)). The Third Circuit has made clear that injury to reputation alone is not enough to satisfy this "stigma-plus" test. *Id*.

To satisfy the "stigma" prong of the test, it must be alleged that the purportedly stigmatizing statements (1) were made publicly, and (2) were false. *Id.* at 236. To satisfy the "plus" prong of the test, the additional injury must be "some concomitant infringement of a protected right or interest." *Ersek v. Twp. of Springfield*, 102 F.3d 79, 83 n.5 (3d Cir. 1996).

In his opposition to the School Defendants' motion to dismiss, Grim argues that he has satisfied the pleading standard because "Grim's confrontation with Louis Hartman in the presence of Grim's son and a security officer would certainly meet the 'sigma plus' standard.  During that event, Grim was wrongfully accused of attempting to abscond with his son (i.e., thus a felon kidnapper) when he was, in fact, abiding by the same prior restraints that inherently infringe upon his right to participate in his children's education."  (Pl.'s Opp'n to Sch. Defs.' Mot. to Dismiss 19).

Assuming that Grim's confrontation with Mr. Hartman would qualify as a "stigma,"[13] Grim has still failed to plead a "plus."  Grim does not claim that he suffered any additional harm caused by Mr. Hartman's allegedly defaming statements.  *See Ersek*, 102 F.3d at 84 ("[T]he harm must be caused by the falsity of the statements").  Grim references the infringement of "his right to participate in his children's education."  (Pl.'s Opp'n to Sch. Defs.' Mot. to Dismiss 19); *see also* (Second Am. Compl. ¶ 98) (pleading same under Count IV).  This argument fails on two fronts.  First, the restrictions placed upon Grim by the School Defendants occurred in August and December 2013.  (Second Am. Compl., Exs. B, D.)  These alleged infringements were therefore not caused by or concomitant with Mr. Hartman's later statements on March 21, 2014.  (*Id.* ¶¶ 40-44.)  Second, these alleged infringements are not infringements at all because, as explained above, Grim does not have a due process right to unlimited access to school property, staff and records.  *See* Part II.B, *supra.*  Count IV is dismissed against the School Defendants.

---

[13]     Grim has not laid the foundation for *Monell* liability to attach to Mr. Hartman's statements such that the School Defendants would be liable.  A municipality cannot be held liable for the acts of its employees on a theory of *respondeat superior*.  *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 691 (1978).  To hold the School District and/or Oxford Valley liable for Mr. Hartman's statements, Grim would have to allege that Mr. Hartman accused Grim of kidnapping his son pursuant to an official municipal policy or a custom of which a municipal decisionmaker knew and acquiesced.  *McTernan v. City of York*, 564 F.3d 636, 658 (3d Cir. 2009).  Grim fails to do this in the Second Amended Complaint.

**Conclusion**

For the foregoing reasons, Counts I-IV are dismissed against the Police Department and the School Defendants.  Grim does not seek leave to amend his complaint a third time.  However, "even when a plaintiff does not seek leave to amend, if a complaint is vulnerable to 12(b)(6) dismissal, a District Court must permit a curative amendment, unless an amendment would be inequitable or futile."  *Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004) (citing *Grayson v. Mayview State Hosp.,* 293 F.3d 103, 108 (3d Cir. 2002)).  At the same time, "repeated failure to cure deficiencies by amendments previously allowed" is among the justifiable reasons to deny leave to amend.  *Foman v. Davis,* 371 U.S. 178, 182 (1962).

Grim has been allowed to amend his complaint twice thus far; the Second Amended Complaint represents the third version of Grim's operative pleading.  After the filing of each version of Grim's complaint, the Defendants have moved to dismiss, challenging Grim's claims on numerous grounds.  Grim has been unable to cure his pleading's deficiencies.  Considering the submissions to date, granting Grim leave to amend his complaint again would be futile.  Allowing Grim a fourth complaint cannot change the dispositive issues here:  that the Police Department did not impose the complained-of restrictions on Grim; that the School Defendants had a rational basis for issuing the restrictions on Grim; and that Grim's general parental rights do not include unfettered access to school property, staff, and records.  There are no additional allegations Grim can make that can cure these deficiencies.  Counts I-IV are accordingly dismissed against both the Police Department and the School Defendants with prejudice.

An appropriate Order follows.

 */s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.

30